

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

WILLIAM C. DUFFELMEYER,

                Plaintiff,              07 Civ. 11352 (KMK)(MDF)

    -against-

STEPHEN MALFITANO, individually,       **FIRST AMENDED**
JOSEPH CANNELLA, individually,         **COMPLAINT**
TOWN/VILLAGE BOARD OF THE
TOWN OF HARRISON, New York,
BOARD OF POLICE COMMISSIONERS
OF THE TOWN/VILLAGE OF HARRISON,
New York, and the TOWN/VILLAGE OF
HARRISON, New York               **Jury Trial Demanded**

                Defendants.

------------------------------------------------------------x

       Plaintiff WILLIAM C. DUFFELMEYER by his attorneys Lovett & Gould, LLP,

for his First Amended Complaint respectfully states:

## NATURE OF THE ACTION

       1. This is an action for compensatory and punitive damages, resulting from

jointly engaged-in conduct of the Defendants taken while acting in concert and under

color of the laws of the State of New York, proximately resulting from violations of

Plaintiff's rights as guaranteed by the First Amendment to the United States Constitution,

42 U.S.C. §1983.

## JURISDICTION

       2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

## THE PARTIES

3. Plaintiff WILLIAM C. DUFFELMEYER is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. He is employed as a sworn member of the police department of the Defendant Town/Village of Harrison. At all times relevant, he has been an active and vocal member of the Town's Police Benevolent Association (hereinafter "PBA") where he held a position on the PBA's Executive Board.

4. Defendant STEPHEN MALFITANO (hereinafter "Malfitano"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly elected Supervisor/Mayor of the Defendant municipal corporation. As such he is a voting member of the Defendant Town/Village Board and the Defendant Board of Police Commissioners.

5. Defendant JOSEPH CANNELLA (hereinafter "Cannella"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was a duly elected member of the Defendant Town/Village Board. As such he too is a voting member of the Defendant Board of Police Commissioners.

6. Defendant TOWN/VILLAGE BOARD OF THE TOWN OF HARRISON, New York (hereinafter "Board"), is the duly elected governing body of the Defendant TOWN/VILLAGE OF HARRISON, New York (hereinafter "Town"), a municipal corporation duly existing by reason of and pursuant to the laws of the State of New York. Defendant BOARD OF POLICE COMMISSIONERS OF THE TOWN/VILLAGE OF HARRISON, New York (hereinafter "Board of Police Commissioners), is comprised of

the members of the Town/Village Board and bears statutory responsibility, pursuant to Section 5711q of the New York State Unconsolidated Laws and the Westchester Police Act (special state legislation enacted as c. 812, L. 1936, as amended) for the oversight and administration of the Police Department of the Town.

## THE FACTS

7. On February 2, 2007, four members of the PBA/Police Department filed an action titled DeVittorio v. Hall, 07 Civ. 0812 (WCC) (hereinafter "DeVittorio I") in this Court, alleging violations of their rights as guaranteed by the First and Fourth Amendments to the United States Constitution, 42 U.S.C. §1983 as well as violations of the Omnibus Crime Control and Safe Streets Act of 1968 as amended.

8. On or about March 7, 2007, Plaintiff and other members of the PBA/Police Department filed an action alleging substantially the same factual allegations as DeVittorio I under the caption Carpiniello v. Hall, 07 Civ. 1956 (WCC). The Carpiniello and DeVittorio actions were consolidated. A copy of the Carpiniello complaint is annexed hereto as Exhibit A and full incorporated herein by reference thereto.

9. Defendants moved to disqualify Plaintiff's counsel in both the DeVittorio I and Carpiniello actions.

10. While that motion was pending, and by correspondence dated March 28, 2007, Plaintiff and other members of the PBA/Police Department advised the members of the Town's Board of Police Commissioner and Police Captain Anthony Marraccini in writing in pertinent respect:

"This letter is to inform you of a disturbing set of circumstances

that may constitute the possible commission of a crime..

In January, 2007, [PBA] President Tancredi was conducting a customary examination of the many donations the Harrison Police Association receives during the Christmas holiday season. Pursuant to his examination, President Tancredi noticed that Brae Burn Country Club, as well as other donors, had not sent their customary annual donation. He inquired with the administration at Brae Burn CC as to whether they had sent or were going to send their annual donation for 2006. The administration said that they had made a donation of $2,500.00 and that the check was personally picked up by Chief Hall at Brae Burn CC. The Brae Burn CC administration said that they would look into the matter and get back to President Tancredi. President Tancredi and other members of the [PBA'S] executive board were contacted a short time later and the Brae Burn CC administration was disturbed to find out that the check had been altered and the funds had been deposited in the New York State Chiefs of Police Association account (Chief Hall was the President of the Chiefs Association at the time). The Brae Burn administration was very clear with President Tancredi that the check was made out to the Harrison Police Association and was intended to be a charitable donation to the Harrison Police Association (see enclosed copy of check). Brae Burn said they received a receipt (see enclosed copy) for an advertisement in the Chiefs of Police Association Journal a short

time after Chief Hall picked up the check, but apparently Chief

Hall never discussed the advertisement with the Brae Burn

charitable donation committee and Brae Burn did not authorize

anyone to cross out Harrison in the payee line and replace it with

Chiefs. They also said they were very surprised when they saw that

the funds had gone to the Chiefs of Police Association and not the

Harrison Police Association.

President Tancredi, under his belief that a mistake had been

made, discussed the matter with the Association's executive board

and some other members of the Association. Vice President

Michael Walther subsequently asked Chief Hall if he had any

checks or donations that were intended for the Harrison Police

Association. The hope was that a mistake had been made. In the past,

some donations that were intended for the Association had been

mistakenly deposited into the Town of Harrison accounts and

reimbursements by the Town were made to the Association when

the errors were made apparent. Chief Hall, however, informed

Vice President Walther that he did not have any checks or any

funds that were intended for the Association.

. . .[T]he [PBA] members concluded that it was possible that the

Brae Burn donation check may have been intentionally altered and

redirected into the Chiefs of Police account. As this would

constitute a criminal act, it [is] the understanding of the members of

5

the Association with knowledge of this possible crime that we have

an obligation to report the incident to the Harrison Police

Department. . .We respectfully request that you investigate this

matter on our behalf. . .It is also our understanding that if we are

not comfortable or disagree with the results of your investigation,

we reserve the right as potential crime victims to pursue the matter

with another law enforcement agency."

11. As a proximate result of the imposition of an unlawful gag order, and on April

6, 2007, Plaintiff, and other members of the PBA/Police Department, filed Duffelmeyer

v. Marshall, et al, 07 Civ. 2807 (WCC) (hereinafter "Duffelmeyer I") in this Court,

alleging a violation of his rights as guaranteed by the First Amendment to the United

States Constitution, 42 U.S.C. §1983. A copy of the complaint in that action is annexed

hereto as Exhibit B, which includes a copy of the March 28, 2007 correspondence

referenced *supra*, and both are fully incorporated herein by reference thereto.

12. Defendants then moved to dismiss Duffelmeyer I.

13. During the pendency of that motion, Chief of Police David Hall advised

Plaintiff in substance that he and the other PBA/Department members who signed the

March 28, 2007 correspondence "should be scared." He also accused Plaintiff of having

"no loyalty."

14. By Report and Recommendation dated October 15, 2007, the Hon. Mark D.

Fox recommended to District Judge Kenneth M. Karas that the motion to dismiss be

denied. On or about March 24, 2008, the Hon. Kenneth M. Karas adopted the Report and

Recommendation and denied Defendants' motion to dismiss.

15. By Opinion and Order dated December 12, 2007, the Hon. William C. Connor denied Defendants' motion to disqualify Plaintiffs' counsel in DeVittorio I/Carpiniello.

16. On December 13, 2007 following an executive session discussion of Judge Connor's decision, Malfitano, Cannella and another elected official of the Town voted (as members of the Town Board and/or members of the Board of Police Commissioners) to twice skip Plaintiff for promotion to the rank of Sergeant in favor of two lesser qualified candidates.

17. Defendants' final administrative determinations to twice skip Plaintiff for promotion was, either in whole and/or in substantial respect, motivated their intent to retaliate against Plaintiff for: (a) his association with the PBA and in that connection his expressions on matters of public concern; (b) having filed DeVittorio I/Carpiniello; (c) having expressed his concerns in the March 28, 2007 letter to the Defendant Town/Village; and/or (d) having filed Duffelmeyer I.

18. As a result of Defendants' determination Plaintiff has been caused to suffer: substantial pecuniary losses; irreparable and on-going injury to his career path in the Police Department; public humiliation; public embarrassment; shame; anxiety; emotional upset; and he has otherwise been rendered sick and sore.

## AS AND FOR A FIRST CLAIM

19. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "18", inclusive.

20. Under the premises Defendants' retaliatory conduct violated, and daily continues to violate, Plaintiff's rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A SECOND CLAIM

21. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "18", inclusive.

22. Under the premises Defendants' conduct and/or retaliatory conduct violated, and daily continues to violate, Plaintiff's right of association as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully requested:

    a.  Awarding against the individually named Defendants such punitive damages as the jury may impose,

    b.  Awarding against all Defendants such compensatory damages as the jury may determine,

    c.  Awarding reasonable attorney's fees and costs, and,

    d.  Granting such other and further relief as to the Court seems just and proper.

Dated: White Plains, N.Y.
      March 31, 2008

LOVETT & GOULD, LLP
By: _____
Kim Berg (KB1425)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

8

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

STEPHEN M. CARPINIELLO, WILLIAM C.
DUFFELMEYER, MICHAEL WALTHER, PAUL
SPICONARDI, ARTHUR MARINELLI,                   07 Civ.    (    )
STEVEN HEISLER, SCOTT FORREST, and
JEFF NARDI,
                              Plaintiffs,        **COMPLAINT**

            -against-

DAVID HALL, individually, ANTHONY
MARRACCINI, individually, and the
TOWN/VILLAGE OF HARRISON, New                    **Jury Trial Demanded**
York,

                              Defendants.        # 07 CIV. 1956
------------------------------------------------------------x

         Plaintiffs STEPHEN M. CARPINIELLO, WILLIAM C. DUFFELMEYER,

MICHAEL WALTHER, PAUL SPICONARDI, ARTHUR MARINELLI, STEVEN

HEISLER, SCOTT FORREST, and JEFF NARDI, by their attorneys Lovett & Gould,

LLP, for their complaint respectfully state:


## NATURE OF THE ACTION

         1. This is an action for compensatory and punitive damages proximately resulting

from the conduct of Defendants, engaged in jointly under color of the laws of the State of

New York, for violations of Plaintiffs' rights as guaranteed by the First, Fourth, and

Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983, and the

Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §2520.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

## THE PARTIES AND CERTAIN
## BACKGROUND FACTS

3. Plaintiff STEPHEN M. CARPINIELLO is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was employed by the Defendant Town/Village (hereinafter "Town") and served as an active and vocal member of the Town's Police Benevolent Association (hereinafter "PBA") since he is a sworn member of the Town's Police Department. As such he has non-disruptively expressed his opinion with respect to a series of crimes (delineated *infra*) committed by Defendants, including their secret installation of a surveillance camera (with both audio and video capacity) in the men's locker room at Police Headquarters. In that connection he also spearheaded PBA discussions, advocating that the matter of the camera be investigated by an law enforcement agency other than the Westchester County District Attorney's Office. As a proximate result he has, *inter alia*: suffered demeaning changes in his work assignment; suffered a punitive alteration of his work schedule; and has been assigned to perform duty assignments normally given to junior supervisory personnel.

4. Plaintiff WILLIAM C. DUFFELMEYER is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was employed as a sworn member of the Town's Police Department and as such was an active and vocal member of the PBA where he held a position on the PBA's Executive Board. In his capacity as a member of the PBA

2

he has non-disruptively expressed his opinion with respect to the said series of crimes as committed by the Defendants and as a proximate result was in or about December 2006, denied an otherwise promised promotion to the rank of Sergeant by the Defendants. By reason of Defendants' retaliation, proximately resulting from *inter alia* Plaintiff's expression of said opinion, he out of fear of further reprisals declined to run for re-election to the PBA's Executive Board.

5. Plaintiff MICHAEL WALTHER is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was an active and vocal member of the PBA, currently serving as its Vice President, in which capacity he has non-disruptively expressed his opinion with respect to the same series of crimes. By reason of Walther's expression of those concerns, and because he determined to seek the PBA Vice Presidency, he was: i) barred by Marraccini from working the Department's "court security detail", a source of overtime compensation; ii) repeatedly ordered by Marraccini to report to Marraccini's office where he was warned not to associate with Ralph Tancredi in his capacity as PBA President; iii) falsely accused (along with Paul Spiconardi) of spreading "rumors" detrimental to the Police Department; iv) threatened by Marraccini with expulsion from the PBA and *inter alia;* v) summoned by Hall to his office where he was interrogated by Hall regarding his communications with the PBA's attorney and the PBA's intentions with respect to investigating the crimes referenced *infra.* In that connection Hall advised Plaintiff that due to Sergeant Peter DeVittorio's expression of concerns regarding, amongst other departmental improprieties, the camera he (DeVittorio) would never be promoted to the rank of Lieutenant.

3

6. Plaintiff PAUL SPICONARDI is a citizen of the United States, a domiciliary of the State of Florida and formerly a resident of the Northern Counties. At all relevant times referenced in this complaint he was a sworn member of the Town's Police Department and both an active and vocal member of the PBA. As a PBA member he non-disruptively expressed his opinion with regard to the same series of crimes.

7. Plaintiff ARTHUR MARINELLI is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was an active and vocal member of the PBA and since January 1, 2006, has served as Chairman of the PBA's Board of Trustees. In his capacity as a member of the PBA he has non-disruptively expressed his opinion with respect to the same series of crimes and in that connection participated in meetings regarding the PBA's pursuit of an investigation of those crimes by an outside law enforcement agency. As a proximate result Plaintiff, as Chairman, and the other members of the Board of Trustees were threatened by Marraccini to the effect that if they were "covering up" for the PBA's President (regarding supposed theft of PBA money as falsely alleged by Marraccini) they were subject to indictment.

8. Plaintiff STEVEN HEISLER is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was an active and vocal member of the PBA and in that capacity non-disruptively expressed his opinion with respect to the same series of crimes. As a result he was threatened by a Marraccini supporter (Police Officer Charles Mascali), who warned Plaintiff that by associating with the PBA President he was going to "get into trouble". Thereafter and by reason of Plaintiff's expression of said opinion Defendants

4

rejected his application to become a member of the Department's Community Policing

Unit and denied him specialized training that would enhance his professional career and

potential for promotion. Out of fear of additional reprisals by Defendants, Plaintiff

stopped attending PBA meetings, stopped expressing his opinion regarding the subject

crimes, and sought assignment to a midnight tour of duty to avoid interacting with

Marraccini and/or Hall.

9. Plaintiff SCOTT FORREST is a citizen of the United States, a domiciliary of

the State of New York, and a resident of the Northern Counties. At all times relevant to

this complaint he was an active and vocal member of the PBA and in that capacity non-

disruptively expressed his opinion with respect to that series of crimes. In that connection

he strongly advocated that the PBA pursue through an outside law enforcement agency

an investigation of those crimes, advising the PBA membership that in the absence of

such an investigation the Police Department would become a "free for all" in which

Marraccini could engage in further criminal wrongdoing with impunity. In response

Marraccini challenged Plaintiff's reference to a "free for all", and improvidently inquired:

"Do you want to see me taken out of here in handcuffs?"

10. Plaintiff JEFF NARDI, currently the Chairman of the Board of Trustees of the

PBA, is a citizen of the United States, a domiciliary of the State of New York, and a

resident of the Northern Counties. At all times relevant to this complaint he was an active

and vocal member of the PBA, having for the past approximately five years as a Trustee,

and in that capacity he too non-disruptively expressed his opinion regarding the same

series of crimes. In that connection he actively participated in meetings and discussions

with PBA counsel regarding investigation of the camera and the false accusations of

5

criminal wrong doing directed at PBA President Tancredi by Defendant Marraccini as set forth *infra*.

11. Defendant DAVID HALL (hereinafter "Hall"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the Town's duly appointed Chief of Police.

12. Defendant ANTHONY MARRACCINI (hereinafter "Marraccini"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a Captain in the Town's Police Department.

13.. Defendant TOWN/VILLAGE OF HARRISON, New York (herein the "Town") is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State. The Town's Police Headquarters building contains, *inter alia*, a men's locker room where male officers - - with an expectation of privacy - - completely undress in order to shower and to change into and/or out of uniform.

## ADDITIONAL MATERIAL FACTS

14. Prior to December 24, 2005, without the knowledge, permission and/or consent of the Plaintiffs or any of them, Defendants surreptitiously installed a surveillance camera, with both audio and video capability, in the men's locker room at Police Headquarters. The installation and use of that camera had nothing whatsoever to do with the conduct of Hall and/or Marraccini's lawful authorized duties as members of a law enforcement agency.

6

15. Thereafter Defendants: i) video taped Plaintiffs and other officers while they were in the various states of undress or exposed; ii) both recorded and listened to their private conversations for purposes of spying on them; iii) gathered and memorialized their (the officers') thoughts regarding departmental corruption; iv) obtained for dissemination photographs of them while they were compromised by reason of their state of undress; and, *inter alia*, v) seized otherwise personal information regarding their intentions/objectives as members and/or officers of the PBA.

16. On December 24, 2005, a Police Officer discovered the camera as secreted in the locker room and reported its presence to Sergeant Edward Lucas, the then "Tour Supervisor". Lucas took photographs of the camera.

17. On December 25, 2005, the discovery of the camera was reported to the then Tour Supervisor, Sergeant Vincent Musollino, who also photographed the camera.

18. On December 26, 2005, the PBA President (Ralph Tancredi) was informed by Police Officer Arlotta about the discovery of the surveillance camera. That same day Arlotta notified Hall about the discovery.

19. As a result Hall - - falsely professing: "When I find out who did this, he is going to be fired" - - entered the locker room and tore the surveillance camera from both its mooring and wiring - - following which Hall and another officer (Lieutenant Marshall) entered the attic of Police Headquarters to remove the wiring that had lead from the audio/video equipment to an in-house video screen and a recording device.

20. Within minutes Tancredi, in his capacity as PBA President, arrived at Headquarters at which time Hall improvidently blurted: "Ralph, it was never hooked up. No audio, no audio. We could never get it to work".

7

21. Hours later Marraccini, in reference to the PBA and the PBA President, cautioned the Police Officer who had first discovered the surveillance camera: "You created some mess!"

22. Because the presence of the surveillance camera in the locker room constituted evidence of criminal wrong doing, on or about December 27, 2005, the PBA President and PBA attorney Richard Bunyan demanded in writing that Hall and Marraccini safeguard and not destroy all evidence pertaining to the camera. In response Hall summoned Bunyan, Tancredi in his capacity as PBA President, and the Executive Board of the PBA and demanded that the writing be retracted. Improvidently disclosing his willingness to tamper with evidence, Hall then screamed:

"I'll take the evidence outside and burn it in

front of Rich[ard] Bunyan!"

23. When Hall was advised that the PBA intended to report the locker room surveillance camera to an outside law enforcement agency, Hall responded by threatening the PBA's Executive Board, PBA President Tancredi and PBA counsel Bunyan: "I'll turn Anthony [Marraccini] loose on them [PBA members pursuing the surveillance camera issue]".

24. On December 29, 2005, Marraccini advised members of the PBA that he personally had installed the locker room camera. As he improvidently admitted:

". . .I did not covertly videotape anyone in the locker

room. . .I [Marraccini] am not a homosexual. . .[and] I

Marraccini] was not watching your balls".

8

Marraccini then showed Tancredi the surveillance camera, which had both audio and

video output jacks, claiming: "This was never hooked up" - - a representation definitively

contradicted by: i) the photographs taken by members of the PBA of the surveillance

camera as secreted in the locker room, which photographs depict both audio and video

output wiring connected to the camera; ii) Marraccini's later admission that the

surveillance camera in fact captured "an image" as depicted on Marraccini's computer in

the Police Department; and iii) Hall's conduct, as observed by members of the

Department, when he ripped the surveillance camera free from its wiring.

    25. As a proximate result of the discovery and report regarding the camera,

effective on or about December 31, 2005, Defendants began punitively assigning the

Police Officer who discovered the camera to so-called "walking posts" - - an assignment

usually reserved for junior members of the Department - - with the objective of

humiliating him and signaling Defendants' intention to take retaliatory action to suppress

PBA members' expression of concern about the unlawful audio and videotaping in the

locker room.

    26. As a proximate result of Tancredi's expressions of concern as PBA President

regarding the installation of the surveillance camera, Defendants punitively assigned him

to "Post 1" and/or "Post 2" with the intention of humiliating and degrading him since

those assignments routinely are given to junior officers. In that connection Tancredi was

twice advised by supervising Sergeants: "They [Hall and Marraccini] don't want you in

the [Police Headquarters] building", "They [Hall and Marraccini] don't want you

anywhere where you can come in the building".

27. On January 31, 2006, Marraccini advised the Officer who had discovered the camera that a permanent investigative assignment which Marraccini several months earlier had proposed be given to him had instead been given to another officer - - a punitive action that Marraccini mockingly characterized as a demonstration of "ingenuity by the Chief".

28. In February 2006 the locker room surveillance camera was first discussed at a PBA meeting - - following Tancredi and Bunyan's informal inquiry of the District Attorney's Office regarding its illegality.

29. As a member of the PBA (Police Sergeant) Peter DeVittorio expressed his opinion at the meeting that the placement of the camera in the locker room made the PBA membership "victims" of wrongdoing actionable criminally and/or civilly. Following a rancorous discussion of these issues the PBA adopted a resolution to report the installation of the locker room surveillance camera officially to an outside law enforcement agency and to ascertain whether the camera's installation violated the rights of the PBA membership. At or about the same time one of Marraccini's departmental supporters (Lt. Marshall) advised Tancredi during a meeting in Marraccini's office that Bunyan had given the PBA bad legal advice regarding the camera and should, as a result, be "fired".

30. Commencing in or about March and/or April of 2006 Marraccini (aware of the PBA's pursuit of the surveillance camera issue and determined to stop it) began making a series of false accusations against Tancredi in his capacity as PBA President - - claiming that Tancredi had misspent PBA moneys. At or about the same time Marraccini and Marshall also began threatening disciplinary action against the other

10

members of the PBA's Executive Board if they refused to falsely report to the District Attorney's Office that Tancredi had supposedly illegally spent PBA funds. Thereafter at Marraccini and Hall's request, the District Attorney's Office made inquiry into the issue of the expenditure of those moneys, concluding that criminal wrongdoing had not occurred.

31. Under these circumstances Marraccini made three demands of the PBA's Executive Board:

> i) Retract the letter demanding that evidence concerning the surveillance camera not be destroyed - - a retraction that would have facilitated the destruction of the camera with impunity and potentially circumvented a criminal charge of Tampering with Evidence,

> ii) Fire the PBA attorney - - to silence Bunyan with respect to the surveillance camera and strip the PBA of legal guidance with respect to it, and for,

> iii) Tancredi to resign as PBA President - - in order to silence him, deprive those members of the PBA (including Plaintiffs who supported him with respect to his challenge to Defendants' misconduct concerning the surveillance camera) of their leadership, to chill Tancredi's PBA supporters and abort through silence and intimidation any further investigation with respect to the camera.

32. On or about April 25, 2006, Tancredi and Bunyan provided to the so-called Public Integrity Unit of the District Attorney's Office evidence regarding the surveillance camera - - including photographs, and *inter alia* police reports.

11

33. By the time that the May 2006 PBA meeting was held Marraccini had, by means of threats and coercion, induced four of the members of the PBA's Executive Board (the Vice President, the Recording Secretary, the Treasurer, and the Financial Secretary) to publicly albeit falsely accuse Tancredi of engaging in criminal wrongdoing with respect to the expenditure of PBA funds.

34. In June and/or July of 2006 the Executive Board of the PBA, as influenced by Marraccini, fired Bunyan as its counsel with a view towards undercutting further criticism of the Defendants by outspoken members of the PBA (including each of the Plaintiffs) regarding the locker room surveillance camera.

35. Prior to the October 2006 PBA meeting (at which nominations for elective office are routinely made), Marraccini influenced certain individuals to run as candidates on his "slate" with a view towards taking complete control of the PBA and putting an end to PBA members' expressions of concern regarding the surveillance camera. Marraccini's slate lost the election.

36. Thereafter Sergeant Michael Olsey, who had previously been a supporter of Plaintiffs' pursuing the surveillance camera issue, began a series of public, verbal attacks on Tancredi claiming that Tancredi: "Funded his lifestyle through the PBA". Hall and Marraccini within days assigned Olsey to the position of "Commander of the Detective Division" and also put him in charge of the Department's School Resource Officer program - - despite Sergeant Peter DeVittorio's seniority and better qualifications for that assignment. At or about the same time Detective Lieutenant Douglas Buschel (who had previously expressed criticism of the Defendants regarding the surveillance camera) accepted a nomination to become a member of the PBA's Executive Board. The very

12

next day he was removed by Hall and Marraccini as Commander of the Detective Division.

37. On or about November 27, 2006, while at the Harrison Funeral Home, Marraccini confronted Police Officer Edward Arce and advised that he (Arce) was "stirring the pot" (a reference to Arce's outspokenness as a PBA member regarding the surveillance camera), cautioned him to "get with the right [Marraccini] team", to stop the "rhetoric [regarding the camera]" and to "get with the right people", that is Marraccini, Hall and their supporters in the Department.

38. In or about November and December 2006 Marraccini directed subordinate officers to visit local business establishments and request for purposes of supposed investigation copies of PBA bills. Marraccini then falsely accused Tancredi of misusing a PBA credit card and threatened Sergeant Schanil with a suspension from duty if he did not report this supposed wrongdoing to the District Attorney's Office.

39. Stepping up his attacks on the PBA, Marraccini then began contacting former, financial contributors to the PBA to persuade them to stop donating money in support of the union - - and instead to donate money directly to the Police Department.

40. As a proximate result of Defendants' conduct none of the Plaintiffs will again express criticism of Hall, Marraccini and/or the Town with respect to the surveillance camera, Defendants' punishment of the PBA for advocating an independent investigation of same, for Defendants' insinuating themselves into the 2006 PBA election process with a view towards taking control of the PBA and silencing it, and/or reporting Defendants' criminal wrongdoing (Coercion, Attempted Coercion, Official Misconduct, Unlawful

Surveillance, and *inter alia* Eavesdropping) to any outside law enforcement agency unless compelled by grand jury and/or trial subpoenas to do so.

41. As a proximate result of Defendants' conduct and/or retaliatory conduct Plaintiffs have been forced to suffer: violations of their right to privacy; violations of their right to be free from illegal eavesdropping; violations of their right to be free from illegal searches/seizures; violations of their associational rights and right to both free speech and to petition government for the redress of grievances; emotional upset; public humiliation; public shame; public embarrassment; pecuniary losses including loss of overtime and loss of promotion; destruction of their professional careers and career paths; irreparable injury to their professional and personal reputations; anxiety; and they have otherwise been rendered sick and sore.

## AS AND FOR A FIRST CLAIM

42. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "41", inclusive.

43. Under the premises Defendants' conduct violated Plaintiff's right to privacy as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A SECOND CLAIM

44. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "41", inclusive.

45. Under the premises Defendants' conduct and retaliatory conduct violated Plaintiffs' rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

### AS AND FOR A THIRD CLAIM

46. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "41", inclusive.

47. Under the premises Defendant' conduct violated Plaintiffs' rights as guaranteed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §2520.

### AS AND FOR A FOURTH CLAIM

48. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "41", inclusive.

49. Under the premises Defendants' conduct violated Plaintiffs' rights as guaranteed by the Fourth Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully requested:

    a.  Awarding against the individually named Defendants such punitive damages as the jury may impose,

    b.  Awarding against all Defendants such compensatory damages as the jury may determine,

    c.  Awarding reasonable attorney's fees and costs, and,

15

d.  Granting such other and further relief as to the Court seems just and

proper.

Dated: White Plains, N.Y.
       March 2, 2007

LOVETT & GOULD, LLP
By:_____
    Jonathan Lovett (4854)
Attorneys for Plaintiffs
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

WILLIAM C. DUFFELMEYER, MICHAEL
WALTHER, STEVEN HEISLER, JEFF NARDI,
STEPHEN M. CARPINIELLO, EDWARD
ARCE, RALPH TANCREDI, PETER
DeVITTORIO, MICHAEL MARINELLI,
and ARTHUR MARINELLI,



07 Civ.

                                        Plaintiffs,

                 -against-

LAWRENCE MARSHALL, individually,
DAVID HALL, individually, and
the TOWN/VILLAGE OF HARRISON,
New York,

                                        Defendants.

-----------------------------------------------------------x

**07 CIV. 2807**

**Jury Trial Demanded**

      Plaintiffs WILLIAM C. DUFFELMEYER, MICHAEL WALTHER, STEVEN

HEISLER, JEFF NARDI, STEPHEN M. CARPINIELLO, EDWARD ARCE, RALPH

TANCREDI, PETER DeVITTORIO, MICHAEL MARINELLI, and ARTHUR

MARINELLI by their attorneys Lovett & Gould, LLP, for their complaint respectfully

state:

### NATURE OF THE ACTION

      1. This is an action for compensatory and punitive damages, resulting from

jointly engaged-in conduct of Defendants taken while acting under color of the laws of

the State of New York, proximately resulting of violations of Plaintiff's rights as

guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

1

**JURISDICTION**

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

**THE PARTIES**

3. Plaintiffs WILLIAM C. DUFFELMEYER, MICHAEL WALTHER, STEVEN HEISLER, JEFF NARDI, STEPHEN M. CARPINIELLO, EDWARD ARCE, RALPH TANCREDI, PETER DeVITTORIO, MICHAEL MARINELLI, and ARTHUR MARINELLI are citizens of the United States, domiciliaries of the State of New York, and residents of the Northern Counties. Each of the Plaintiffs is employed as a sworn member of the police department of the Defendant Town/Village of Harrison.

4. Defendant LAWRENCE MARSHALL (hereinafter "Marshall), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a Lieutenant in the police department of the said Town/Village.

5. Defendant DAVID HALL (hereinafter "Hall"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as the Chief of Police of the Defendant Town/Village.

6. Defendant TOWN/VILLAGE OF HARRISON, New York (hereinafter "Town"), is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State.

## THE FACTS

7. By correspondence dated March 28, 2007, Plaintiffs Duffelmeyer, Heisler, Carpiniello, Tancredi, Walther, Arce, and DeVittorio advised the members of the Town's Board of Police Commissioner and Police Captain Anthony Marraccini in pertinent respect:

> "This letter is to inform you of a disturbing set of circumstances that may constitute the possible commission of a crime..
>
> In January, 2007, [PBA] President Tancredi was conducting a customary examination of the many donations the Harrison Police Association receives during the Christmas holiday season. Pursuant to his examination, President Tancredi noticed that Brae Burn Country Club, as well as other donors, had not sent their customary annual donation. He inquired with the administration at Brae Burn CC as to whether they had sent or were going to send their annual donation for 2006. The administration said that they had made a donation of $2,500.00 and that the check was personally picked up by Chief Hall at Brae Burn CC. The Brae Burn CC administration said that they would look into the matter and get back to President Tancredi. President Tancredi and other members of the [PBA'S] executive board were contacted a short time later and the Brae Burn CC administration was disturbed to find out that the check had been altered and the funds had been deposited in the New York State Chiefs of Police Association account (Chief Hall was the President of the Chiefs Association at the time).

3

The Brae Burn administration was very clear with President Tancredi that the check was made out to the Harrison Police Association and was intended to be a charitable donation to the Harrison Police Association (see enclosed copy of check). Brae Burn said they received a receipt (see enclosed copy) for an advertisement in the Chiefs of Police Association Journal a short time after Chief Hall picked up the check, but apparently Chief Hall never discussed the advertisement with the Brae Burn charitable donation committee and Brae Burn did not authorize anyone to cross out Harrison in the payee line and replace it with Chiefs. They also said they were very surprised when they saw that the funds had gone to the Chiefs of Police Association and not the Harrison Police Association.

President Tancredi, under his belief that a mistake had been made, discussed the matter with the Association's executive board and some other members of the Association. Vice President Michael Walther subsequently asked Chief Hall if he had any checks or donations that were intended for the Harrison Police Association. The hope was that a mistake had been made. In the past, some donations that were intended for the Association had been mistakenly deposited into the Town of Harrison accounts and reimbursements by the Town were made to the Association when the errors were made apparent. Chief Hall, however, informed

4

Vice President Walther that he did not have any checks or any

funds that were intended for the Association.

. . .[T]he [PBA] members concluded that it was possible that the

Brae Burn donation check may have been intentionally altered and

redirected into the Chiefs of Police account. As this would

constitute a criminal act, it [is] the understanding of the members of

the Association with knowledge of this possible crime that we have

an obligation to report the incident to the Harrison Police

Department. . .We respectfully request that you investigate this

matter on our behalf. . .It is also our understanding that if we are

not comfortable or disagree with the results of your investigation,

we reserve the right as potential crime victims to pursue the matter

with another law enforcement agency."

Annexed to the complaint and made and part hereof are copies of the referenced

correspondence and enclosures.

8. Within a matter of hours of the delivery of the correspondence referenced in the

preceding paragraph "7", Hall directed Marshall and others in the administration of the

Police Department to investigate the PBA members' complaint - - not with a view

towards ascertaining if a crime had indeed been committed, but rather with the self-

serving objective of covering-up that crime and silencing the Plaintiffs.

9. In that connection Marshall personally advised the Plaintiffs or virtually all of

the Plaintiffs that the were ordered to silence and were henceforth forbidden to

communicate with any other law enforcement agencies and/or members of the Harrison

Police Department and/or members of the Harrison Police Association with respect to their fact-based beliefs that Hall had forged the subject check, been in criminal possession of that forged instrument, and intentionally stole on behalf of his Chiefs Association moneys he knew were intended for the Harrison Police Association.

      10. With respect to the "gag" order imposed by Marshall for Hall, Marshall informed Plaintiffs that the issue of Hall's apparent commission of several felonies was being referred to the so-called Public Integrity Bureau of the Westchester County District Attorney's Office - - a circumstance that Plaintiffs recognized to be part of an orchestrated cover-up since the District Attorney herself:

      a. Is a personal friend of Hall,

      b. Is deeply indebted to Hall for securing her endorsement by the Chiefs of Police Association during her recent election campaign for the office of District Attorney - - and will need that endorsement again when she runs for re-election,

      c. Is by reason of that indebtedness and friendship going to cover-up through the so- called Public Integrity Bureau Hall's crimes rather than prosecuting him, and,

      d. Will not request that the Governor appoint a special prosecutor despite the District Attorney's obvious conflict of interest because the appointment of a special prosecutor would interfere with the District Attorney's expected cover-up.

11. Each of the Plaintiffs is aware of Marshall's order, Marshall and Hall's threat of retaliatory disciplinary action in the event of non-compliance, and the self-evident cover-up presently underway to insulate Hall from criminal prosecution.

12. As a proximate result each of the Plaintiffs has been chilled in the prospective exercise of his rights of association, speech and to petition government for the redress of grievance. None will risk the threat of a disciplinary prosecution with the prospect of an indefinite suspension without pay. None will report to any other law enforcement agency the apparent crimes as committed by Hall. None will discuss the matter further.

13. By reason of Defendants' conduct each of the Plaintiffs has been caused: emotional upset; anxiety; violations of their First Amendment protected rights; humiliation; embarrassment; shame and has otherwise been rendered sick and sore.

### AS AND FOR A CLAIM

13. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "`12", inclusive.

14. Under the premises Defendants' conduct violated Plaintiffs' rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully demanded:

    a. Awarding against the individually named Defendants such punitive damages as the jury may impose,

    b. Awarding against all Defendants such compensatory damages as the jury may determine,

    c. Awarding reasonable attorney's fees and costs, and,

    d.  Granting such other and further relief as to the Court seems just and

proper.

Dated: White Plains, N.Y.
       April 6, 2007

LOVETT & GOULD, LLP
By:_____
      Jonathan Lovett (4854)
Attorneys for Plaintiffs
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

8

**Harrison Police Department**
**650 North Street**
**Harrison, NY 10528**
**(914) 967-5111**

03-28-07

To: Captain Anthony Marraccini
From : Officers listed herein
Re: Possible crime committed

Captain,

This letter is to inform you of a disturbing set of circumstances that may constitute the possible commission of a crime.

In January, 2007, President Ralph Tancredi was conducting a customary examination of the many donations the Harrison Police Association receives during the Christmas holiday season. Pursuant to his examination, President Tancredi noticed that Brae Burn Country Club, as well as other donors, had not sent their customary annual donation. He inquired with the administration at Brae Burn CC as to whether they had sent or were going to send their annual donation for 2006. The administration said that they had made a donation of $2500.00 and that the check was personally picked up by Chief Hall at Brae Burn CC. The Brae Burn CC administration said that they would look into the matter and get back to President Tancredi. President Tancredi and other members of the executive board were contacted a short time later and the Brae Burn CC administration was disturbed to find out that the check had been altered and the funds had been deposited in the New York State Chiefs of Police Association account (Chief Hall was the President of the Chiefs of Police Association at the time). The Brae Burn administration was very clear with President Tancredi that the check was made out to the Harrison Police Association and was intended to be a charitable donation to the Harrison Police Association (see enclosed copy of check). Brae Burn said they received a receipt (see enclosed copy) for an advertisement in the Chiefs of Police Association Journal a short time after Chief Hall picked up the check, but apparently Chief Hall never discussed the advertisement with the Brae Burn charitable donation committee and Brae Burn did not authorize anyone to cross out Harrison in the payee line and replace it with Chiefs. They also said that they were very surprised when they saw that the funds had gone to the Chiefs of Police Association and not the Harrison Police Association.

President Tancredi, under the belief that a mistake had been made, discussed the matter with the Association's executive board and some other members of the Association. Vice President Michael Walther subsequently asked Chief Hall if he had any checks or donations that were intended for the Harrison Police Association. The hope was that a mistake had been made. In the past, some donations that were intended for the Association had been mistakenly deposited into Town of Harrison accounts and reimbursements by the Town were made to the Association when the errors were made

apparent. Chief Hall, however, informed Vice President Walther that he did not have any checks or any funds that were intended for the Association.

President Tancredi and the other members of the Association with knowledge of the events in question now needed legal advice and advice was sought from multiple sources. This took a few weeks because some of the attorneys were not available when the Association members were available. After legal consultation (and only after these legal consultations), the members concluded that it was possible that the Brae Burn donation check may have been intentionally altered and redirected into the Chiefs of Police account. As this would constitute a criminal act, it the understanding of the members of the Association with knowledge of this possible crime that we have an obligation to report the incident to the Harrison Police Department. This letter is intended to serve as notification to you and the department of this incident. We respectfully request that you investigate this matter on our behalf and notify us of the results of your investigation. It is also our understanding that if we are not comfortable or disagree with the results of your investigation, we reserve the right as potential crime victims to pursue the matter with another law enforcement agency.

We would also like to note at this time that we are making this notification due to our legal and departmental obligations. We are, however, fearful of retaliatory action on the part of the Harrison Police Department administration and we would like that to be noted at this time. It is our sincere hope and expectation that we will be given the understanding and courtesy shown to other potential crime victims by the Harrison Police Department.

_57/103_
P.O. RALPH TANCREDI

DET. MICHAEL WALTHER

_125/120_
P.O. Edward A. Arce

SGT. PETER J. DEVITTORIO

PO
PO JOHN AVDEA

_12/106_
P.O. WILLIAM DUFFELMEYER

P.O. STEVEN HEISLER _124/119_

DET. ISSA KHAROUBA _103/116_

DET. LT. Douglas J. Buschel

LT. Stephen M. Carpiniello